## Case No. 13,787.

### TAYLOR v. The COMMONWEALTH.

[14 Am. Law Reg. (N. S.) 86.]

Circuit Court, E. D. Missouri. 1873.[1]

MARITIME LIEN — REPAIRS — HOME PORT — OTHER SECURITY — PLEADING — SETTING UP DIFFERENT LIEN.

1. A maritime lien will be created for repairs done on a boat or vessel at the home port, if the repairs are made on the credit of the boat or vessel; but where the person doing the work stipulates for other and different security from that of the boat or vessel, the maritime lien is waived and cannot be enforced.

2. Where a party in his libel sets up an admiralty lien, he cannot be allowed if that fails to set up and rely upon a common-law or statutory lien.

[Appeal from the district court of the United States for the Eastern district of Missouri.]

This was an appeal from a decree of the district court upon a libel in rem. [The libel was filed by Daniel G. Taylor, administrator, to recover for repairs made on the steamboat Commonwealth.] The facts appear in the report of the case when before the district court. [Case No. 13,788.]

G. Campbell, for the steamboat, appellant.
Krum & Patrick, for libellant.

MILLER, Circuit Justice. The owner of the steamboat Commonwealth is a resident of St. Louis; the repairs therefore were done in what, in admiralty, is technically known as the "home port" of the vessel, and our supreme courts have decided for forty or fifty years that no admiralty lien exists by reason of supplies and repairs furnished in the home port of the vessel. There is no decision of the supreme court of the United States reversing or changing that doctrine, but the sentiments of the profession of the country—that part of the profession which devotes itself to the admiralty practice—and the sentiment, I think, of the parties interested in vessels, has been that that doctrine is not the correct one. It is a doctrine which we have derived from the English courts, and it is the doctrine of the English courts that no such admiralty lien can be had in the home port of the country. The English courts say, that when a man has a lien on a vessel of that kind, he holds possession of her, like the lien of a carpenter or a carriage-maker for repairing anything in his trade; and while he holds possession of that lien, if he keeps possession, he may have such statutory lien as the laws of the land give him; but he has no maritime lien for such services in a home port, and we have followed that doctrine. It is not the doctrine of the continental countries, it was not the doctrine of the civil law. The doctrine is the

other way in all the continental courts. Our courts, however, have followed the English courts in that, and held that if supplies or repairs are furnished in a foreign port, that is in any port where the vessel is found needing those supplies or repairs, other than that in which the owner lives, the admiralty law creates a lien on the vessel. Supplies and repairs can be furnished, and the man that furnishes them has a lien on the vessel on the ground that the owner is not there, that it is necessary that the repairs should be made, that they are necessary to the vessel in order to enable it to prosecute a voyage, and that the master having ordered them, the merchant may furnish them in a foreign port to the master and have a lien on the vessel. We have followed that doctrine in the courts of the United States, but as I said before there has been a very strong feeling that the doctrine ought to extend to the home ports, and a rule which the supreme court of the United States had prescribed for the proceedings and practice in admiralty courts, which forbids the bringing of a suit in rem in that class of cases, has been repealed by the supreme court. I violate no propriety, I think, in saying that the supreme court repealed that rule with a view for consideration, and it will come up; and it is involved in this case to come extent, or is supposed to be involved in this case. I have no hesitation myself in saying in this case that if there was nothing more than the fact stated originally, that Captain Taylor repaired this vessel to the extent of $21,000, I would affirm the judgment of the district court, which confirmed the lien and ordered the vessel to be sold and the money to be appropriated to pay that debt. I believe that that will be the doctrine which will be held by the supreme court, and I have no doubt that the law adopted by the English courts is not the general maritime law. In this country we are governed, where it is a question of maritime law, by the maritime law, the continental law, or the law as it may be gathered from all the maritime nations of the world. The English law, on the contrary, has been the result of the conflict between the courts of common law, especially the court of king's bench in Great Britain, which was jealous alike of all other courts, as it was of the court of admiralty and ecclesiastical courts, which was always issuing its prohibitions in defence of what it supposed to be the exclusive right of the common-law courts, and to that spirit of asserting the extended and exclusive jurisdiction of the common-law courts in opposition to the admiralty courts. To this is due alone the fact that the English courts adopted the rule that for work and labor done on a vessel in a home port there was no lien on the vessel other than the common-law lien of possession, and that when that was parted with the lien was gone.

I have no hesitation in saying myself, therefore, that the rule of allowing a lien for these repairs ought to be extended to a vessel in a home port, as well as to a vessel in a foreign port, and that this vessel, and this work and labor, are of a character which, in my opinion, probably constitute such a lien, if the parties had permitted it to rest on the implied results of the work and labor done under such circumstances. But, unfortunately, they did not. They entered into a specified contract for this work. There is no doubt about that contract, although some little doubt is expressed as to the precise reliance placed upon it by Mr. Taylor. The contract itself, I think, shows for itself what he did rely on, and that is the trouble in this case. Before the vessel was docked, and before any work was done on her, they made a specific agreement, which was reduced to writing, not signed by the parties, but a memorandum made by the agent of the wrecking company, and that agreement is this: That if the repairs did not exceed $10,000 they were to be paid for one-half in cash, and the balance in an endorsed note; if they exceeded $10,000 they were to be paid one-third in cash and the balance in endorsed notes, payable, I think, in thirty, sixty and ninety days. As to what "endorsed notes" meant, there is no controversy. It meant personal security. Now, the contract was: "That for this work I am going to do for you, you are to pay me a considerable portion in cash, as the work progresses, or before you get the vessel, and at the end of it you are to pay me the balance in good negotiable notes, with proper and sufficient security." I have no doubt of the fact that a man doing that kind of work may rely on the owner of the vessel, and that if he makes no specific contract on the subject, he will have a right against the owner and the vessel, and under some circumstances against the master; but that is a lien which the law implies from the circumstances, and if a specific contract is made which shows that the party relied upon other security and other modes of payment, then he cannot enforce the admiralty lien. It is very clear to me, here, that Captain Taylor, in making this contract, never intended to rely on the security of the vessel itself, because he made this contract for the very best kind of other payment. What better payment can a man have than secured papers? And what is the use of his relying on the vessel as security when he says: "Before you get this vessel out of my hands, you are to pay me one-half cash, and the balance in endorsed notes with good security."

I think, having made an express contract for an express security, he cannot say, "I did this work on the credit of the vessel." In other words, I think if there is any question of admiralty lien, a lien for supplies and repairs, that it must have been the intention

in the mind of the party who furnishes the supplies and repairs whether in a home or foreign port, to rely on the credit of the vessel; and although in a foreign port (and I suppose the same thing would apply here when the supplies and repairs are necessary, and nothing is said to the contrary), the law presumes a reliance on the vessel. yet it is only a presumption. But it is said that in foreign ports such is the presumption, because the man who furnishes the supplies is not there and may not know anything of the owner. If it can be shown that he did not rely on that alone, and that he intended to rely on other security, which he supposed sufficient, or which was supposed to be better, then he had no lien, because the lien arises from implication, from the fact expressed or implied that the man in furnishing the supplies or contracting a debt, relied on the vessel as security, and if he relied on anything else it is another security sufficient, or supposed to be, which, in case that turned out to be insufficient, does not restore his lien. I am sorry for this result, because it seems this corporation is a mere sham, and whether any party belonging to it may be individually liable or not, I do not know. But the result of it is that this decree must be reversed. Now it has been very ably urged that if there was no maritime lien, there were two other liens under which this court ought to give relief. The first was that the plaintiff never parted with the possession of the vessel, that he instituted this suit when he had possession, and therefore he has the lien of common law, the lien of a man who has done work on any instrument, or vehicle, or piece of property, and retained the possession until he is paid. I have no doubt he had the lien, or of the existence of it. It is also said that the state gave a lien for these repairs on the vessel. I have no doubt about that. But neither of these liens is subject to the implication in regard to the maritime lien, and it cannot be held, and it is not an admissible doctrine, that a man can go into an admiralty court and assert an admiralty lien, and when he fails in that, turn around and say: "To be sure, I did not have a lien that would give jurisdiction, but now that you have got hold of the thing, you must go on and enforce some other lien." If such a condition of things existed, the result would be, that any party could come into an admiralty court when he failed in maintaining an admiralty lien, having seized the vessel, and say: "You have got possession of the vessel and now you must turn round and administer the state law," and cite authorities to show that the admiralty court will enforce the lien of the state law. That is not now the doctrine of our courts. These cases have been reversed and decided several times, and this court in admiralty will not enforce the lien of the state laws. Decree reversed.